STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-654


PHILLIP SENSAT

VERSUS

WASHINGTON GROUP INTERNATIONAL, INC.


**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - DISTRICT 03
PARISH OF CALCASIEU, NO. 10-08402
SAM L. LOWERY, WORKERS' COMPENSATION JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Sylvia R. Cooks, Oswald A. Decuir, and Shannon J. Gremillion, Judges.


**AFFIRMED IN PART, REVERSED IN PART.**


Marcus Miller Zimmerman
Attorney at Law
4216 Lake Street
Lake Charles, LA 70605
(337) 474-1644
COUNSEL FOR PLAINTIFF/APPELLEE:
    Phillip Sensat

Charles W. Farr
Lawrence & Associates
225 St. Ann Drive
Mandeville, LA 70471
(985) 674-4446
COUNSEL FOR DEFENDANT/APPELLANT:
    Washington Group International, Inc.

**GREMILLION, Judge.**

This case answers the question of whether the office of Workers' Compensation properly exercised jurisdiction over the plaintiff/appellee's claim for benefits. Washington Group International, Inc. (WGI), appeals the judgment in favor of Phillip Sensat that awarded Sensat "disability indemnity payments under the Louisiana Workers' Compensation Act for any period of time after termination of Florida workers' compensation benefits on August 24, 2010 when Phillip Sensat was unemployed and not receiving unemployment compensation benefits," medical benefits in the form of knee replacement surgery, $2,000.00 in penalties, and attorney fees of $12,300.00. For the reasons that follow, we affirm in part and reverse in part.

## FACTS

Sensat was an ironworker rigger employed by WGI at a nuclear power plant in Crystal River, Florida, on February 7, 2010, when he injured his right knee. The parties stipulated that the injury occurred in an accident that arose from and was in the course and scope of Sensat's employment with WGI.[1] Despite his knee injury, Sensat continued to work until June 18, 2010.

Sensat's knee had been operated on in 1986. After the accident, Sensat was treated by Dr. Lynn Foret, a Lake Charles orthopedic surgeon, who recommended that his right knee be replaced.

Before the February 2010 accident, Sensat worked on twelve to fifteen projects for WGI. These jobs spanned the United States. In his fourteen years in the nuclear industry, Sensat qualified for a "red badge," which he explained one

---

[1] There is some question about precisely by what entity some of the players in this drama were employed. It appears that WGI and a French company, AREVA, each owned a half interest in "Steam Generator Team," for which the gentlemen actually worked, but there is no indication that Steam Generator Team was separately incorporated. The distinction appears to make no difference, because there appears to be no controversy that Sensat was employed by WGI.

earns through extensive radiation training. The "red badge" allows a worker entry into the most sensitive areas of a nuclear power plant, the reactor building and spent fuel pool. A "red badge" employee, then, is a valuable asset because from day one on the job he can begin working in sensitive areas without having to be trained.

Sensat first heard of the Crystal River job while working for WGI at the Three Mile Island nuclear plant in Middletown, Pennsylvania. His supervisor at Three Mile Island, Ed Phelps, informed Sensat of the Crystal River project during the waning days of the Three Mile Island project. Sensat returned home to Lake Charles and contacted the ironworkers' union local[2] in Tampa, Florida, to have his name placed on its rolls.

On January 28, 2010, Sensat received a call from Jack Jarrell, the business manager of the Tampa local, who advised Sensat to be at the Crystal River plant on February 1. Sensat testified that he thought at that point that he had the job; otherwise, he would not have driven to Tampa. However, Sensat confirmed that Jarrell did not hire him for the Crystal River job

When he arrived at the plant, Sensat completed a job application with WGI. He then completed a federal W-4 withholdings form. Sensat completed the two-day training to familiarize himself with the layout of the plant and started work. Had he not completed this training, Sensat would not have been allowed to enter the plant.

While at Three Mile Island, Phelps was informed of a problem at Crystal River that WGI wanted him to oversee. Phelps's recollection of the conversation he had with Sensat at Three Mile Island was clear:

---

[2] Local 397 of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL/CIO.

As soon as they [WGI] called me and told me they had a problem here, I talked to him [Sensat] about his availability to come down here. It's something that we do fairly regular [sic]; folks that have worked with us before will come to another job with us. As soon as I found out that I was probably going to go down here, I started to talk to Phil to see if he was interested in coming with me.

. . . .

I asked him if he was interested in coming down here, and he said yes. I told him that I'd like to get him on here as soon as I could. From what he said, he had some stuff that he had to take care of at home, that he wouldn't be available for a couple of weeks. I said, well, I'll get you on there as soon as you're ready to go.

Phelps contacted Sensat at his home not only because he knew Sensat was dealing with a personal tragedy, the death of his mother, but also to determine whether he was still interested in working at Crystal River.

Phelps was asked whether he had authority to hire. He testified that Allen Anderson, the project director, was responsible for contacting the union local about hiring. However, Phelps also testified that Anderson "gets me the people that have worked with us before, you know what I mean. The kind of common practice is to drag around some of the boomers that you've worked with before."

Anderson explained that at the present time, WGI no longer exists as a legal entity, its interests having been acquired by URS and AREVA, two separate companies. Anderson is a project director for URS. He also explained that URS acquired the WGI interests at about the time of the subject accident involving Sensat.

The Crystal River plant had experienced cracking in its containment room. URS was hired to manage the repair work. It assigned Anderson to direct the project. URS is signatory to a national labor agreement, the General Presidents' Project Maintenance Agreement, which it entered into with several unions. URS prioritizes its hires: highest preference is for workers who are "badged;" next

3

come workers with previous experience in the nuclear power industry; and third would be those with no previous nuclear industry experience. Those workers have to be requested at least three days in advance so that FBI background checks can be run. Anderson was also required to factor the amount of time needed for on-site, site-specific training, in addition to a full FBI background check dating back at least five years or to the past year if the worker has been employed by URS within that year.

Anderson does not request workers by name, and more specifically he did not request Sensat by name. Indeed, the letter sent by Anderson to the union local simply requested ten journeymen for one date and twenty for another, with current or previous qualifications and badging. The union only has responsibility to refer workers to URS; URS does the hiring. Under the terms of the labor agreement, all workers are on probationary status until they satisfy the nuclear facility's requirements in terms of drug and alcohol screening, background checks, plant access training, and other basic training courses.

Jarrell testified that he was a business agent for the union local in 2010. He was responsible for the manpower call-outs for the Crystal River project. He would receive a manpower request from Anderson. Jarrell would first vet local ironworkers for qualified individuals. If there were too few qualified local workers, Jarrell would reach out to other qualified workers. He contacted Sensat about a referral to the Crystal River project. Jarrell would have been contacted first by Sensat, who would have asked that his name be placed on the local's list. Jarrell testified, "When people hear that there's a project in that circuit, that particular circuit, [the local's phone] rings off the hook." However, Jarrell did not have authority to hire workers for the Crystal River project.

4

WGI did not request any particular worker on that project. He had no recollection of either Phelps or Anderson specifically requesting that Sensat be referred to the Crystal River project. Jarrell had to be satisfied himself that the workers he referred to the job were qualified, so he had all "travelers" complete a personal history questionnaire, or PHQ. He would have contacted Sensat about completing a PHQ and faxing it back to the local before Sensat would be referred to the job.

The Workers' Compensation Judge (WCJ) also heard from Richard Flodman, who at the time was Steam Generator Team and WGI's Labor Relations and Human Performance Manager. Flodman testified that the ironworkers' local does not have authority to hire. All "referrals" from the local have to meet WGI's qualifications. An employee's records do not follow him from one nuclear plant job to the next. An experienced worker has to go through much the same application process and training as would an inexperienced worker. Only the site manager and the project manager have the authority to hire an employee; Phelps was neither and had no authority to hire. Flodman was somewhat familiar with Sensat and knew that he had worked for WGI in South Carolina, Three Mile Island, and another job in Florida before Crystal River. However, he has no control over whom the ironworkers' local refers to the site. Local members who meet the labor requisition qualifications are given preference over those from outside the area.

All employees must pass background checks performed by the plant operator. The operator of the Crystal River plant was Progress Energy. The operator conducts the site-specific training; however, according to Flodman, a prospective referral from the local is hired before he receives the training, but if he fails to pass he is terminated.

5

After his accident, Sensat was placed on light duty, but felt obligated to defer to an able-bodied iron worker. He told Phelps that the next time there was a lay-off, he wanted his name placed on the lay-off list so that an able-bodied worker could keep his job. Sensat's last day on the Crystal River job was June 18, 2010. He was paid workers' compensation benefits under the auspices of Florida law until August 24, 2010.

Sensat continued to work, though. His next job was at the Waterford plant near New Orleans from November 20, 2010 through mid-February 2011, when he left for higher wages at the S.T.P. plant in Bay City, Texas. That job was completed in May 2011. Between jobs, Sensat has drawn unemployment benefits. He has also worked at jobs outside iron working. Sensat has turned down no work whatsoever since he left Crystal River, in fact. He testified, though, that his knee inhibits his ability to climb and perform other activities required of an iron worker.

Sensat labored under the impression that WGI would request that certain individuals be referred by the union. According to Sensat's reading of the labor agreement, the contractor, such as WGI, could name fifty percent of the workers for a project and the union local was forced to accept those people. He also apparently believed that his name was one of those WGI would have requested.

Following trial, the WCJ reasoned that the intent of the parties is of paramount consideration in determining whether a Louisiana contract for hire had been effected. Given Sensat's almost unique qualifications in a technically demanding, specialized industry, it was reasonable for him to have assumed when he left for Florida that he had the Crystal River job in hand. He was repeating a process he had gone through many, many times. The WCJ was cognizant of the fact that "[u]nions are notoriously protective of their turfs." He doubted that the local would have tolerated Sensat being called into the Crystal River job if that was

6

not a standard practice. The local, in short, was, according to the WCJ, WGI's agent. The WCJ termed WGI's argument that Sensat was not hired under a Louisiana contract a "reconstruction and re-invention of what was obviously its original intentions and actions . . . conceived only after this man was disabled by a work injury and the company found itself facing a workers' compensation suit." The WCJ further stated:

> I'm not certain what the company's formal definition of the term "employee" is, but I think it more than likely covers an individual who is on the job site and is being paid handsomely to be there.
> Of course, the reason the company paid Mr. Sensat is that it, like him, thought he had been hired in Louisiana and was sent directly to work. I think both were correct in their assumptions. The evidence fully supports their assumptions.
> . . . .
> Having heard the testimony, I am struck with the notion that had Mr. Sensat had [sic] never hurt his knee in Florida, the technical issue of the precise shining moment in time when he was actually officially hired would have never arisen. The company's post-accident posturing is clever, but it flies squarely in the face of the long employment relationship of Mr. Sensat and Washington Group.

The WCJ then ruled in favor of Sensat, finding that he was hired under a Louisiana contract of employment, and ordered that WGI pay all reasonable medical expenses including knee replacement surgery, weekly indemnity for any period Sensat was unemployed or not receiving unemployment benefits, and a $2,000.00 penalty and $12,300.00 in attorney fees. WGI then filed this appeal.

## ASSIGNMENTS OF ERROR

WGI asserts the following errors:

1. Because WGI did not offer employment to Sensat while he was in Louisiana, it was error for the trial judge to find that he was working under a Louisiana contract of hire at the time of his accident,

2. Because there is no evidence that Sensat has suffered a wage loss as a result of this accident, and because it is speculative to assume that any future periods of unemployment are the result of his injury and not other factors, it was error for the trial judge to award

disability indemnity benefits for periods during which Sensat was unemployed and not receiving unemployment benefits.

3. Regardless of whether WGI ultimately prevails in its jurisdictional argument, the decision to deny payment of benefits and medical expenses pursuant to Louisiana law was reasonable, and thus, it was error for the trial judge to award penalties and attorney fees on the basis that WGI failed to "reasonably controvert" the claim.

**ANALYSIS**

*Assignment of error number 1:* An employee working outside Louisiana who is injured, and would be entitled to benefits under Louisiana law if he is injured in Louisiana, may recover benefits if, at the time of his injury, his employment was "principally localized in this state," or he was working under a contract of hire made in this state. La.R.S. 23:1035.1. Extraterritorial coverage has been extensively litigated even before Section 1035.1 was enacted in 1975.

Identifying whether a Louisiana contract of hire has been confected is largely a matter of applying certain fundamental precepts of contract law, principally the tenet that the purpose of the inquiry is to divine the intent of the parties. *See*, e.g., *McKane v. New Amsterdam Cas. Co.*, 199 So. 175 (Orl.App. 1940). This court, as well as other circuits, has long held that in an effort to discern the intent of the parties, courts should consider the domiciles of the parties, the place of performance of the contract, and the nature of the work to be done. *Milligan v. Glenburney Nursing Home*, 408 So.2d 40 (La.App. 3 Cir. 1980).

While this represents a fact-intensive, case-specific inquiry, previous holdings do lend guidance. In *Jepson v. B-Con Construction Company, Inc.*, 475 So.2d 112 (La.App. 2 Cir. 1985), an employee domiciled in Caddo Parish previously worked there for the construction company, which was also domiciled in Caddo Parish. He contacted his former supervisor to inquire about potential work. The supervisor told the employee to come to Memphis, Tennessee, and he

8

would put him to work. The employee traveled to Memphis and was hired by the supervisor while his application was processed in Shreveport.

The supervisor was instructed by home office to transport some equipment to Shreveport, as it was needed on another job. The employee was asked whether he would travel to Shreveport to assist with this task. After successfully delivering the equipment to Shreveport, the employee was killed in a traffic accident near Little Rock, Arkansas.

The parents of the employee sought death benefits under the Louisiana Workers' Compensation Act. The employer argued that the Act did not apply. The court of appeal found that the record made it clear that the acceptance of the employee's application was "a mere formality. . . of no legal significance." *Id.* at 115. It found that a Louisiana contract of hire had been confected and Louisiana law applied.

In *Mattel v. Pittman Construction Co.*, 248 La. 540, 180 So.2d 96 (1965), the employee, a member of the New Orleans ironworkers local, reported to the union hall looking for work. The union local's business manager had received a work order for two men at a job in Gulfport, Mississippi from the prospective employer. Mattel was referred by the business manager to the Gulfport job. He was injured that day.

The construction company argued that Louisiana law did not apply. The supreme court disagreed:

> As a general rule, in bargaining or in other dealings with employers, a union represents only its members. However, when it and an employer enter into an arrangement such as is evidenced here the union becomes the agent of the employer (for employment purposes) and is authorized to make a job offer for the latter. Accordingly, the acceptance of the offer by a prospective employee completes the contract of hiring.

We do not agree with the defendants' contention that, because Pittman had the right to reject any person sent to it by the union, the offer made by the New Orleans Local to the plaintiff constituted a mere proposal for him to apply in Gulfport for a job; that plaintiff applied in Gulfport and there he was accepted by the foreman; and that; and that, therefore, the contract is not one over which Louisiana courts have jurisdiction.

To begin with the plaintiff was not rejected; he was immediately put to work at the Gulfport job for which his services had been solicited in New Orleans. Moreover, the record is barren of any evidence that it was contemplated that plaintiff was going to Gulfport merely to apply for work. Furthermore, there is no proof of any kind that plaintiff made an application for employment. To the contrary it was shown that he did not go to Pittman's office, did not fill out a written application form, and did not make any oral request for employment. In fact, it does not even appear that the foreman had the authority to r[e]ject any employee sent as a result of Pittman's order for ironworkers (in this connection we think that Pittman's failure to call its foreman to testify-or to explain the reason for such failure-weakens its contention immeasurably). Also noted is the absence of any suggestion that Pittman had ever rejected a union employee sent to a construction site at its request.

*Id.* at 544-45.

In *Welch v. S.J. Groves & Sons Co.*, 555 So.2d 647 (La.App. 4 Cir. 1989), *writ denied*, 558 So.2d 603 (1990), Welch was contacted by his local union and told that there was an opening with the defendant, a New Jersey contractor with no connection to Louisiana, for a heavy equipment operator. He traveled to New Jersey and reported to the union hall there. He was hired and injured in New Jersey. The fourth circuit distinguished the *Mattel* case on the basis that the local in *Mattel* was acting as the agent for the employer, whereas the local merely advised Welch of the job opening. It also found that the fact that Mattel did not have to report to the local union hall in Mississippi was a key distinguishing factor.

More recently, the second circuit dealt with the issue of union agency and found that Louisiana law did not apply in *Hughes v. T.G. Mercer Consulting Serv's.*, 44,908 (La.App. 2 Cir. 12/9/09), 26 So.3d 954, *writ denied*, 10-0361 (La. 4/23/10), 34 So.3d 267. Hughes was a commercial truck driver who belonged to

10

the Teamsters. She lived in Goodwill, Louisiana. The shop steward with Mercer contacted Hughes about hauling pipe for Mercer from Granbury, Texas, to Hillsboro, Texas. Hughes and her fiancé, also a driver, traveled to Texas and began driving for Mercer. He was injured in a collision and argued that Louisiana law should apply because she was employed under a Louisiana contract of hire.

Mercer's Executive Vice-President of Operations testified that Mercer hired its drivers through a referral system that included shop stewards. However, not all drivers who report for work are hired. All drivers are required to complete an application, pass drug tests, and demonstrate their driving abilities before they are hired. This testimony was corroborated by that of the shop steward.

The WCJ found that she had jurisdiction because the shop steward had apparent authority to hire and did not extend conditions of hire, such as applying, passing drug screens, or demonstrating driving ability. Hughes was therefore justified in believing that she was hired. The second circuit disagreed. It undertook a thorough analysis of cases involving union representatives and others who were clothed with apparent authority, and concluded that the shop steward in this case was not an actual or apparent agent for the employer. Hughes knew of the referral network by which drivers were hired. No paperwork had been sent to her in Louisiana. She performed no work before completing paperwork in Texas. Her travel expenses were not reimbursed. There was no evidence that she and Mercer had agreed on wages and hours. Mercer had the right to reject a union worker sent in response to a request for workers. There was no evidence that Mercer had not rejected drivers sent by the union in the past. And federal law mandated that Mercer subject drivers to testing before they could be hired.

This case bears many of the hallmarks of *Hughes*. The out-of-state union local in the present case contacted Sensat in Louisiana. The local referred Sensat

11

to WGI, which did not request him specifically. Sensat was at least marginally aware of the means by which nuclear plant employees were hired. WGI had the authority to reject an employee who was referred by the union. Sensat, like Hughes, had to meet qualifications such as drug screening and testing before he could enter the job site. However, unlike Hughes, Sensat completed paperwork in Louisiana. Further, he operated within an industry that prizes highly-trained, highly-specialized, select employees that are routinely employed at locations across the country.

There is another major distinction between the present case and others we have discussed: Sensat had been hired by WGI many times in the past and had never *not* been hired by it. This represented a salient distinction to the WCJ, and it is to this court, too. The overall tenor of the testimony established that, Sensat was virtually *guaranteed* work at Crystal River. That tenor sounded through from the testimony of Sensat and every other witness including Anderson, who had little familiarity with Sensat, and Flodman, who was familiar with him. Phelps, who lacked actual authority to hire but was intimately familiar with the hiring process, certainly implied to Sensat that his hiring was a certainty. And while it was a very close case, we are unable to conclude that the WCJ manifestly erred in finding that a Louisiana contract of hire was confected.

We, however, disagree with the WCJ's finding that this was some sham attempt by WGI to dodge its responsibilities to Sensat, as we will more fully discuss in conjunction with WGI's assignment of error number three regarding the award of penalties and attorney fees.

*Assignment of error number 2:* WGI asserts that it was error for the trial court to award indemnity benefits to Sensat. The Act establishes schedules of payments depending upon the nature of the disability the employee has suffered.

12

*See* La.R.S. 23:1221. The WCJ made no finding as to whether Sensat was temporarily totally disabled, permanently totally disabled, permanently partially disabled, or entitled to supplemental earnings benefits.

What was adduced at trial was that Sensat has certainly been capable of working and has in fact worked on many occasions since the accident. However, he testified, and the records of Dr. Foret corroborate, that he is unable to climb, which is a requirement of his trade. In fact, Dr. Foret's records state, "I do not know how he is walking now." This was not a question of Sensat's mechanical gait, but rather a remark about his pain tolerance. Clearly, Sensat's knee has been significantly damaged or exacerbated by this accident.

The employee bears the burden of proving disability by clear and convincing evidence. La.R.S. 23:1221. Under the statutory scheme, Sensat is not eligible for temporary or permanent total disability, because he is capable of employment, and has in fact engaged in employment. La.R.S. 23:1221(1)(b) and (2)(a). Permanent partial disability is reserved for loss of use of an anatomical part or establishment of an impairment rating. La.R.S. 23:1221(4). That leaves supplemental earnings benefits the only indemnity benefit for which Sensat might be eligible.

Sensat offered no evidence of his post-accident wages. He did, however, prove to the WCJ's satisfaction that he was unable to perform iron work. The record adequately supports this finding. But that is not the nature of the inquiry; rather, the questions is whether he proved that he cannot work at all.[3]

Sensat contends that at the time of trial WGI owed him no indemnity benefits. According to Sensat, "The effect of this judgment is that no monetary amount of indemnity benefits were awarded to claimant, just the entitlement to it."

---

[3] Section 1221(3)(a) provides that the disability must result in the employee's inability to earn wages equal to ninety percent of his pre-accident wages.

13

But the WCJ's task is to determine actual controversies and not issue judgments based upon hypotheticals.

In *Desselle v. Dresser Indus. Valve*, 96-374 (La.App. 3 Cir. 2/5/97), 689 So.2d 549, *writ denied*, 97-618 (La. 4/25/97), 692 So.2d 1086, we faced an analogous situation. The injured employee was given work with modifications. He sought a declaratory judgment that he would be eligible for SEBs in the future if he should be unable to work due to his injury. We affirmed the WCJ's refusal to endorse such a procedure. The employee had no claim for SEBs until such time as he was unable to earn at least 90% of his pre-accident wages. This ruling guides our consideration here. While Sensat is gainfully employed he has no claim for temporary total disability benefits. It was premature for the WCJ to award indemnity benefits, and we reverse that award.

*Assignment of error number 3:* Louisiana Revised Statute 23:1201 governs the time and place an employer is obligated to pay his employee for work-related injury benefits. The award of penalties and attorney fees for failing to comply with the employer's obligation to provide reasonable related medical treatment is established by Subsection (F). The penalties and attorney fees, however, do not apply if the claim is "reasonably controverted" or if non-payment results from conditions beyond the employer's or insurer's control. La.R.S. 23:1201(F)(2).

A claim has been reasonably controverted when the employer "engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual or medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed." *Brown v. Texas-LA Cartage, Inc.*, 98-1063, p. 9 (La. 12/1/98), 721 So.2d 885, 890. In *Pettigrew v. Abacus Capital Corp.*, 07-405, pp. 9-10 (La.App. 5 Cir. 12/11/07), 974 So.2d 692, 697, now-Justice Guidry wrote, "[T]he cases considering the issue

14

of whether there was an in state contract of hire are fact specific, and [the insurer] is not without support for its position.  Thus, it is impossible to find that the claim was not reasonably controverted."

As noted above, the WCJ stated that the issue of where Sensat was hired would never have arisen had he not been injured.  This goes without saying; the only time such a dispute would arise is in the context of an employment-related dispute such as workers' compensation.  Such a statement is akin to saying that the question of whether Sensat had been hurt would never have arisen but for the fact that he was hurt.  The evidence demonstrates that the WCJ clearly erred in awarding penalties and attorney fees.  WGI's legal argument was far from frivolous.  This was a very close question.

The WCJ's award of penalties and attorney fees are reversed.

## CONCLUSION

The WCJ's finding that subject matter jurisdiction lies with Louisiana is affirmed.  The award of indemnity benefits is reversed as premature.  The award of penalties and attorney fees is reversed.  Costs of this appeal are taxed to defendant, Washington Group International.

**AFFIRMED IN PART, REVERSED IN PART.**